No. 24-3932

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————————————————————

ELJON LAKO,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

- and -

ARTHUR GARY LAFRANO and ADAM DOBAN,

*Plaintiffs-Appellees,*

vs.

LOANDEPOT, INC., *et al.*,

*Defendants-Appellees.*
————————————————————————

On Appeal from the United States District Court
For the Central District of California
The Honorable Josephine L. Staton
District Court Case 8:21-cv-1449-JLS-JDE
————————————————————————

**APPELLANT'S OPENING BRIEF**
————————————————————————


BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002

*Attorneys for Plaintiff-Appellant Eljon Lako*

Dated:  October 15, 2024

# Table of Contents

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF JURISDICTION ......................................................... 4

STATEMENT OF ISSUES .................................................................... 4

STATEMENT OF THE CASE ............................................................... 5

    I.    Factual Background ................................................................. 5

    II.   The Settlement ....................................................................... 6

    III.  The District Court's Approval of the Settlement ...................... 7

SUMMARY OF THE ARGUMENT ....................................................... 9

STANDARD OF REVIEW ................................................................... 13

ARGUMENT ...................................................................................... 15

    I.    The Court Should Reverse Because There Were *Indicia* of
         Collusion and the Trial Court Failed to Apply Enhanced Scrutiny
         to the Settlement, Which was Reached Prior to Class Certification ....... 15

    II.   Plaintiffs' Damages Report, When Finally Generated and
         Submitted, Wrongfully Omitted Significant Damages and Was
         Unreliable ............................................................................ 24

    III.  Reversal is Also Required Because the Plan of Allocation Is
         Arbitrary, Contrary to the Conclusions of Plaintiffs' Own Expert,
         and Afflicted by Self-Interest ................................................. 33

    IV.  The Court Should Reverse Because the Notice Sent to Absent
         Class Members Did Not Comply With Due Process Requirements
         and the PSLRA ..................................................................... 41

    V.    The Court Should Reverse Because Plaintiffs Failed to Comply
         with the District Court's Directive to Submit a Sufficient Number
         of Declarations From Absent Class Members to Allow the Court
         to Assess the Class's Reaction to the Proposed Settlement .................... 48

CONCLUSION ............................................................................................................... 50

# Table of Authorities

## Cases

*Allen v. Bedolla,*
  787 F.3d 1218 (9th Cir. 2015) ...........................................................9, 14, 15

*Briseño v. Henderson,*
  998 F.3d 1014 (9th Cir. 2021) ........................................................1, 9, 15, 19

*Churchill Vill., L.L.C. v. GE,*
  361 F.3d 566 (9th Cir. 2004) ................................................................. 4, 21

*Class Plaintiffs v. Seattle,*
  955 F.2d 1268 (9th Cir. 1992) ............................................................ 14, 33

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ............................................................................... *passim*

*Dura Pharm., Inc. v. Broudo,*
  544 U.S. 336 (2005) ............................................................................ 18, 32

*Franks v. Kroger Co.,*
  649 F.2d 1216 (6th Cir. 1981) ................................................................... 40

*Hatamian v. Advanced Micro Devices, Inc.,*
  2016 U.S. Dist. LEXIS 34150 (N.D. Cal. Mar. 16, 2016) ...................... 32, 46

*Holmes v. Cont'l Can Co.,*
  706 F.2d 1144 (11th Cir. 1983) ........................................................... 17, 40

*In re Apple Inc. Device Performance Litig.,*
  50 F.4th 769 (9th Cir. 2022) ...................................................................... 1

*In re Bluetooth Headset Prods. Liab. Litig.,*
  654 F.3d 935 (9th Cir. 2011) .............................................................. *passim*

*In re Corel Corp. Sec. Litig.,*
  293 F. Supp. 2d 484 (E.D. Pa. 2003) ......................................................... 41

*In re Finisar Corp. Sec. Litig.,*
  2019 U.S. Dist. LEXIS 88205 (N.D. Cal. May 24, 2019) ...................... 30, 31

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
  142 F.R.D. 588 (S.D.N.Y. 1992) ............................................................... 38

iii

*In re Heritage Bond Litig.*,
   2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) ........................................... 38

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   302 F. Supp. 2d 180 (S.D.N.Y. 2003) .......................................................................... 42

*In re Ocwen Fin. Corp. Sec. Litig.*,
   2017 U.S. Dist. LEXIS 236564 (S.D. Fla. June 21, 2017) ..............................24, 30, 37

*In re Oracle Sec. Litig.*,
   1994 U.S. Dist. LEXIS 21593 (N.D. Cal. June 16, 1994)............................................ 38

*In re The Exxon Valdez*,
   229 F.3d 790 (9th Cir. 2000) ....................................................................................... 14

*In re Veritas Software Corp. Sec. Litig.*,
   496 F.3d 962 (9th Cir. 2007) ..................................................14, 41, 42, 47, 48

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ........................................................................................ 31

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021) ....................................................................................... 18

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ....................................................................................... 15

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ..................................................................................32, 46

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ..................................................................................................... 44

*McKinney-Drobnis v. Oreshack*,
   16 F.4th 594 (9th Cir. 2021) ...................................................................... 10, 16, 20, 21

*Plummer v. Chem. Bank*,
   91 F.R.D. 434 (S.D.N.Y. 1981) .................................................................................... 40

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
   944 F.3d 1035 (9th Cir. 2019) .................................................................... 10, 14, 16, 20

*Silber v. Mabon*,
   957 F.2d 697 (9th Cir. 1992) ....................................................................................... 15

iv

*United States ex rel. Morsell v. Nortonlifelock, Inc.*,
    67 F. Supp. 3d 248 (D.D.C. 2021)................................................................ 30

*Women's Comm. for Equal Emp't Opportunity v. Nat'l Broad. Co.*,
    76 F.R.D. 173 (S.D.N.Y. 1977)................................................................... 40

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001)..................................................................... 50

**Statutes**

15 U.S.C. § 77a....................................................................................................... 4

15 U.S.C. § 78aa..................................................................................................... 4

15 U.S.C. § 78n(a).................................................................................................. 4

15 U.S.C. § 78u–4.............................................................................................. 1, 41

28 U.S.C. § 1291.................................................................................................... 4

28 U.S.C. § 1331.................................................................................................... 4

**Rules**

FED. R. APP. P. 4(a) .............................................................................................. 4

FED. R. CIV. P. 23(g)(2) ........................................................................................ 50

FED. R. EVID. 201 ................................................................................................. 12

## PRELIMINARY STATEMENT

The Court should reverse the approval of the Settlement of this class action under the Securities Exchange Act of 1934 ("Exchange Act") because the District Court failed to apply the proper scrutiny to the proposed settlement. *See In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 776 (9th Cir. 2022) (reversing approval of a settlement because the district court applied "the wrong legal standard"). District courts must ensure that class counsel do not "collude with the defendant to strike a quick settlement without devoting substantial resources to the case." *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021). But a quick settlement was exactly what Class Counsel (Pomerantz LLP) did in the name of court-appointed Lead Plaintiff Arthur Gary LaFrano and self-designated additional plaintiff Adam Doban ("Plaintiffs").

After surviving a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, Plaintiffs and Class Counsel quickly folded their tent, settling the case for a small sum ($3.5 million) and performing no discovery. Plaintiffs negotiated the settlement without a written expert damages report, and thus were uninformed about the potential recoverable damages. Plaintiffs had referenced a generic "damages report" in support of their motion for preliminary approval of the settlement, but did not provide a copy of the alleged report. After Appellant Eljon Lako pointed out this deficiency in his opposition to preliminary approval, Plaintiffs produced a copy of the report in their reply papers.

1

The report produced by Plaintiffs was dated **after** the date that the approval papers had been filed, demonstrating that there had in fact been no written damages report in existence when the papers were filed. Upon scrutiny, the freshly generated damages report revealed that damages from the largest stock drop of the Class Period had been omitted from the damages calculation. In addition, the entire damages report was based on a "price maintenance" theory that Plaintiffs never pled. Despite these deficiencies, the District Court granted preliminary approval of the settlement without engaging in the requisite enhanced scrutiny applicable to settlements reached prior to class certification.

The District Court also approved the notice to class members that failed to disclose anything about the potential recoverable damages. Such notice is defective because it left absent class members uninformed about how the meager $3.5 million proposed settlement compared to what might have been recovered had the case proceeded through discovery and trial.

The District Court improperly rubber-stamped the plan of allocation despite Class Counsel's failure to submit any evidence to support the disparate amounts of price inflation allocated to different portions of the Class Period. The amounts of price inflation used in the plan of allocation were completely different than the conclusions of Plaintiffs' expert, Dr. Nye. For example, Dr. Nye ascribed zero price inflation to February 11, 2021, the day Lead Plaintiff LaFrano bought 5,000 shares of LoanDepot stock, yet the plan of allocation afforded LaFrano the most amount of price inflation

— $2.99 per share. But that was not the end of the "special treatment" for LaFrano. Class Counsel utilized its "discretion" to give LaFrano a 25% price inflation bonus. 3-ER-427 ("any Recognized Loss amount greater than zero for any Securities Act Eligible loanDepot Stock *will then be increased by 25%*"). And Class Counsel requested and received a $5,000 service award for Plaintiff Doban, the same amount as Lead Plaintiff LaFrano, even though Doban was not a court-appointed lead plaintiff and did little more than lending his name to the complaint. As demonstrated below, Class Counsel concealed from the District Court the fact that Doban was actually an in-and-out trader who could not establish loss causation or damages. Yet the District Court certified Doban as a class representative and approved his $5,000 service award.

These defects require reversal of the approval of the settlement. The purpose of the PSLRA was to curb lawyer-driven litigation. Yet the settlement here reflects a results-oriented approach by Class Counsel who settled the case without any discovery solely for a quick payday. There was no basis to exclude the full extent of the damages from the estimated damages. Without manipulating downward the estimated damages, the proposed settlement looks paltry and does not fall within a typical range of approvable securities class action settlements.

For all these reasons, the Court should reverse the approval of the settlement and remand for further proceedings with an instruction to remove Pomerantz as Class Counsel.

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the complaint asserts claims for violations of two federal statutes, Section 11 of the Securities Act of 1933, 15 U.S.C. § 77a, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78n(a). *See* 15 U.S.C. § 78aa(a).

This Court has jurisdiction under 28 U.S.C. § 1291 because the District Court entered final judgment on May 24, 2024. 1-ER-2–9. Plaintiff timely filed his Notice of Appeal on June 18, 2024. *See* 6-ER-1137–1138; Fed. R. App. P. 4(a). Appellant Lako has standing to appeal the entry of the judgment because he timely objected to the settlement. *Churchill Vill., L.L.C. v. GE*, 361 F.3d 566, 572–73 (9th Cir. 2004).

## STATEMENT OF ISSUES

**Issue 1**: Did the District Court err in granting final approval of the securities class action settlement because Plaintiffs failed to provide accurate information about the potential recoverable damages, and because Plaintiffs' damages report was inconsistent with the theory of liability pled by them, thus failing to comply with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)?

**Issue 2**: Should the District Court's approval of the settlement be reversed because the plan of allocation was not fair and reasonable in light of the material differences between the plan's "price inflation" allocations and those of Plaintiffs' expert, because the allocations disproportionately benefitted the Lead Plaintiff, and because Plaintiffs submitted no evidence to support the divergence?

4

**Issue 3**: Were absent class members' constitutional due process rights violated because the notice that was disseminated to them failed to provide information necessary to fully inform class members about the settlement and to avoid misleading the class members?

## STATEMENT OF THE CASE

### I. Factual Background

Plaintiffs filed a class action on behalf of all persons who purchased or acquired shares of LoanDepot's Class A common stock pursuant or traceable to LoanDepot's Registration Statement issued in connection with its initial public offering ("IPO") and who purchased or acquired shares of LoanDepot's common stock from March 16, 2021 through September 22, 2021. 6-ER-995 [Amended Consolidated Class Action Complaint ("CCAC"), ¶ 1.][1] LoanDepot is an independent non-bank retail mortgage lender that provides residential and refinance loans and personal loan products to borrowers in the United States. 6-ER-1000–1001 (¶ 13). The lawsuit names as Defendants LoanDepot, several LoanDepot officers and directors, and the underwriters of LoanDepot's IPO. 6-ER-1006–1009 (¶¶ 29–41).

Plaintiffs allege that Defendants violated Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Exchange Act. 6-ER-1048–1071 (¶¶ 149–

---

[1] Most of these facts are taken from the District Court's May 19, 2024 order granting final approval of the settlement. *See* 1-ER-10–23.

224). Plaintiffs contend that Defendants made false or misleading statements obscuring the following three alleged features of LoanDepot's business: (1) that LoanDepot closed loans without the documentation required by statutes, regulations, and contracts; (2) that LoanDepot improperly collected double daily interest from refinance borrowers and, upon discovery of the erroneous double collection, made the decision to refund customers only in states with active attorneys general; and (3) that LoanDepot experienced declining gain-on-sale margins as the IPO approached. 6-ER-1013–1038 (¶¶ 55–121).

The District Court appointed LaFrano as the Lead Plaintiff even though the District Court recognized that LaFrano did not have the largest financial loss. 6-ER-1078–1093.

## II.   The Settlement

In May 2023, the parties participated in a one-day mediation. The mediation was unsuccessful, but the parties continued to negotiate with the mediator's assistance over the following weeks. Eventually, the mediator proposed a settlement of $3.5 million and, in June 2023, the parties accepted and memorialized such an agreement. 1-ER-40.

The Settlement Agreement established an all-in Settlement Fund of $3.5 million — from which any attorneys' fees, litigation costs, and class representative service awards that the Court awarded would be deducted. 4-ER-718, 722–723. After those deductions were made, the remainder of the Settlement Fund was to be distributed to class members who submitted a valid claim. *See id.*

6

Class Counsel represented to the District Court that they developed the Settlement Agreement's plan of allocation by working with their damages expert, who was subsequently identified as Dr. Zachary Nye. 2-ER-346; 2-ER-199–200. **The Allocation Plan assigns price-inflation figures that vary depending on when Class Members purchased their shares of LoanDepot stock**. Those price-inflation figures are reflected in the Long Notice disseminated to potential Class Members. 2-ER-168–171.

However, the plan of allocation set forth in the notice sent to class members allocated a materially different amount of price inflation to time periods within the class period than the allocations contained in the expert report of Plaintiffs' expert Dr. Nye. *Compare* 4-ER-550–563 *with* 3-ER-411–441.

## III.  The District Court's Approval of the Settlement

In July 2023, Plaintiffs moved for preliminary approval of a class action settlement. 5-ER-948–950. In December 2023, the District Court conditionally granted the motion — requiring submission of a supplemental counsel declaration and a revised notice packet. 1-ER-45, 55, 58. After receiving the requested materials, the District Court preliminarily approved the settlement. 1-ER-24–36. At the preliminary approval stage, the Court certified the Class for settlement purposes, appointed Jonathan D. Park of Pomerantz LLP as Class Counsel, concluded that the then-assessable *Staton* factors weighed in favor of approval of the settlement, and approved the form and method of notice. 1-ER-42–58; 1-ER-27–28. Class Counsel moved for

final approval and attorneys' fees, litigation costs, and class-representative service awards. *See* generally 2-ER-352–354; 2-ER-316–318. Class Counsel requested a fee of 28% of the Settlement Fund. Class Counsel requested "service awards" to Plaintiff LaFrano, who was the only court-appointed Lead Plaintiff, and to Adam Doban, who was never appointed either a lead plaintiff or a class representative. Doban was never deposed, never produced any discovery, did not attend the mediation or participate in any other matter in the case. The District Court awarded $5,000 service awards to both LaFrano and Doban. 1-ER-10–23.

Appellant Eljon Lako, a member of the class who had filed the first complaint against LoanDepot, objected to the proposed settlement, and Class Counsel replied. 2-ER-122–133, 2-ER-111–120. Appellant Lako argued that the proposed settlement was inadequate, and that Plaintiffs had not provided adequate information about the potential recoverable damages, had failed to submit a damages report, and had manipulated the damages calculations in order to attempt to make the meager $3.5 million proposed settlement look better. Appellant also objected on the grounds that the requested attorneys' fees — exceeding the benchmark of 25% — were unwarranted. 2-ER-122–133.

The District Court held a final approval hearing on April 19, 2024. By order dated May 19, 2024, the District Court (1) granted Plaintiffs' motion for final approval; and (2) granted in part the motion for attorneys' fees, costs, and class-representative service awards. The District Court denied the request for a 28% fee, but did award

$875,000 in attorneys' fees — representing 25% of the Settlement Fund. The District Court awarded the requested $90,000 in litigation costs and the requested $5,000 class-representative service awards each for LaFrano and Doban ($10,000 total). 1-ER-23. The District Court did not note any contribution of Doban to the prosecution of the case in its order. The District Court entered judgment on May 24, 2024. 1-ER-2–9. On June 18, 2024, Appellant filed a timely notice of appeal. 6-ER-1137–1138.

## SUMMARY OF THE ARGUMENT

The District Court applied the wrong legal standard in granting final approval to the securities class action settlement. Enhanced scrutiny must be applied here because the settlement was reached prior to class certification. *See In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011). The Ninth Circuit has repeatedly held that notwithstanding the limited appellate review of substantive fairness, "we hold district courts to a higher *procedural* standard when making that determination of substantive fairness: 'To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections.'" *Allen v. Bedolla*, 787 F.3d 1218, 1223–24 (9th Cir. 2015) (emphasis in original) (citation omitted). This is because, "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946. District courts must ensure that class counsel do not "collude with the defendant to strike a quick settlement without devoting substantial resources to the case." *Briseño*, 998 F.3d at 1024. Accordingly,

9

when a settlement precedes class certification, as it did here, the district court must apply "an even higher level of scrutiny." *Roes, 1-2 v. SFBSC Management, LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019) (quoting *Bluetooth*, 654 F.3d at 946); *see also McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606-07 (9th Cir. 2021) (reversing approval of class action settlement because district court failed to evaluate *Bluetooth's* three *indicia* of collusion).

Here, the Plaintiffs engaged in absolutely no discovery prior to agreeing to the low-ball settlement and thus there was not a developed factual basis with which to assess the reasonableness of the settlement. There were also *indicia* of collusion because class counsel sought a fee of 28% of the common fund, which was above the 25% benchmark and not supported in any way due to class counsel's failure to conduct any discovery in the case or engage in any other efforts other than surviving an initial motion to dismiss. In other words, class counsel quickly folded their tent and agreed to a low-ball, $3.5 million settlement of a complex securities class action lawsuit which had the effect of dispensing with the need to commit any further resources to litigating the merits of the case while at the same time maximizing their own fees.

Collusion was also suggested because, as demonstrated herein, Plaintiffs' counsel manipulated the damages analysis to make the settlement appear to represent a larger percentage of recovery than was actually the case. In addition, Class Counsel significantly modified the price inflation amounts in the plan of allocation, completely changing the price inflation amounts from those in their own expert's report. The changes personally benefitted Lead Plaintiff LaFrano. Under Plaintiffs' expert report,

10

zero price inflation was allocated to February 11, 2021, a day on which LaFrano had purchased 5,000 shares of LoanDepot stock. LaFrano's counsel completely changed the opinion of their expert, allocating the most inflation of any period — $2.29 per share — to LaFrano's purchase. The district court's approval of the plan of allocation was also improper because there was evidence to support the price inflation allocations in the plan. As noted herein, Class Counsel represented to the Court that they developed the plan by working with their expert, Dr. Nye, but the plan bears no resemblance to Dr. Nye's conclusions. Class Counsel used five corrective disclosures to measure price impact and allocate damages, but Dr. Nye said that four out of the five could not be used since they were not statistically significant at the required 90% significance level. One had a significant level of just 19.7% and another just 44.4%. None came close to 90% but LaFrano's counsel used them anyway.

Class Counsel — Pomerantz LLP — also improperly sought and received a $5,000 "service award" for its "starter client" Adam Doban, who agreed to file an initial complaint for Pomerantz. Even though Doban was never appointed as a Lead Plaintiff nor as a Class Representative, Pomerantz convinced the district court to award $5,000 to Doban, claiming that no one had objected. But Pomerantz never brought to the district court's attention the fact that Doban's own sworn certification, filed with his initial "placeholder complaint," revealed that Doban was an "in and out trader" who had completely sold his position of LoanDepot stock during the Class Period, thus making him ineligible for any recovery in the case. *See* Ex. 1 to Appellant's Request for

Judicial Notice filed contemporaneously (*Doban v. LoanDepot, Inc., et al.*, No. 21-cv-01513 (C.D. Cal.), Dkt. Nos. 1, 1-1, and 1-2).[2] Neither the district court nor any absent class member could have discovered Doban's in-and-out trader status since the notice sent to class members conveniently omitted this fact, and Doban did not disclose it in the declaration he submitted to support his $5,000 service award. 2-ER-284–287. And since Doban's complaint was not the first-filed complaint, no pleadings from Doban's related action were listed in the master docket for this case.[3] As a result, even if an absent class member had engaged in the extremely unusual step of reviewing the docket in this case, they would not have found Doban's complaint or certification revealing that he was an in-and-out trader. Pomerantz LLP took advantage of these facts to secure, through inadequate disclosure to the district court, a completely unwarranted $5,000 payoff to its client Doban, who did not even have standing to assert a claim or receive any recovery in this class action.

---

[2] Doban's certification states that he bought 12,200 shares of LoanDepot stock on April 12, 2021 and sold all 12,200 shares on June 22, 2021, prior to the end of the Class Period. *See* Ex. 1 to Appellant's Request for Judicial Notice filed contemporaneously (*Doban v. LoanDepot, Inc., et al.*, No. 21-cv-01513 (C.D. Cal.), Dkt. Nos. 1-1 and 1-2).

[3] However, Doban's action was consolidated into the low-numbered action by the District Court (6-ER-1078–1093) and thus could arguably be considered part of the record even though Ninth Circuit Rule of Appellate Procedure 10-2 limits the record on appeal to the pleadings and other papers filed with the clerk in the case appealed from. To avoid any disputes about the issue, Appellant requests judicial notice of Doban's complaint and his Plaintiff's Certification in his individual action pursuant to Rule 201 of the Federal Rules of Evidence in a contemporaneously-filed motion for judicial notice.

Amazingly enough, the collusion did not end there. After seeking and obtaining the $5,000 payoff to Doban, Pomerantz, despite being instructed by the District Court to obtain declarations from absent class members evidencing their reaction to the proposed settlement, submitted only one declaration, *which turned out to be from Doban's wife*. *See* 2-ER -118. Pomerantz's conduct interfered with the District Court's ability to properly assess the reaction of absent class members to the collusive settlement. The PSLRA was designed to prevent this kind of collusion.

The final judgment should also be reversed because class members' due process rights were violated. The class notice did not provide any information about the potential recoverable damages, and the information that was provided had been manipulated by Lead Counsel to make the proposed settlement look more favorable than it was. Absent class members have a constitutional right to exclude themselves from a class action settlement. In evaluating that option, one of the most critical assessments is the value of the proposed settlement compared to the potential recoverable damages. Because the value of the potential recoverable damages was manipulated by Lead Counsel, and because the Plaintiffs' expert calculated damages based on a "price maintenance" theory that was never pled by Plaintiffs in their complaint, absent class members were not provided with critical information.

## STANDARD OF REVIEW

1. **Appeals of orders approving securities class action settlements**. Enhanced scrutiny must be applied here because the settlement was reached prior to

class certification. *See Bluetooth*, 654 F.3d at 935. The Ninth Circuit has repeatedly held that notwithstanding the limited appellate review of substantive fairness, "we hold district courts to a higher procedural standard when making that determination of substantive fairness: 'To survive appellate review, the district court must show it has explored comprehensively *all* factors, and must give a reasoned response to *all* non-frivolous objections.'" *Allen*, 787 F.3d at 1223-24 (emphasis in original) (citation omitted). This is because, "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946. "We review a pre-certification settlement approval not only for whether the district court has "explored comprehensively all factors, . . . given a reasoned response to all non-frivolous objections," and "adequately . . . develop[ed] the record to support its final approval decision," but also for whether the district court has looked for and scrutinized any 'subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations.'" *Roes,* 944 F.3d at 1043 (quoting *Allen*, 787 F.3d at 1223-24).

       2.    **Appeals of orders approving plans of allocation**. A district court's approval of a plan of allocation is reviewed for an abuse of discretion. *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962 (9th Cir. 2007). But any necessary legal questions are reviewed *de novo*. *In re The Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000). A plan of allocation is subject to the same standards as the settlement itself — it must be fair, reasonable, and adequate. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992).

3.    **Appeals Challenging Adequacy of Notice to Absent Class Members**.

Challenges to the adequacy of the notice to class members are reviewed *de novo*. *Lane v. Facebook, Inc.*, 696 F.3d 811, 834 (9th Cir. 2012); *Silber v. Mabon*, 957 F.2d 697, 700 (9th Cir. 1992).

## ARGUMENT

I.    **The Court Should Reverse Because There Were *Indicia* of Collusion and the Trial Court Failed to Apply Enhanced Scrutiny to the Settlement, Which was Reached Prior to Class Certification**

The judgment approving the class action settlement should be reversed because the district court failed to apply ***enhanced scrutiny*** and did not comprehensively analyze all relevant factors, especially in light of the paltry settlement that was reached prior to class certification and before class counsel had engaged in any discovery. *See Bluetooth*, 654 F.3d at 935. The Ninth Circuit has repeatedly held that notwithstanding the limited appellate review of substantive fairness, "we hold district courts to a higher procedural standard when making that determination of substantive fairness: 'To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections.'" *Allen*, 787 F.3d at 1223-24. (emphasis in original) (citation omitted). This is because, "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946. District courts must ensure that class counsel do not "collude with the defendant to strike a quick settlement without devoting substantial resources to the case." *Briseño*, 998 F.3d at 1024.

Accordingly, when a settlement precedes class certification, as it did here, the district court must apply "an even higher level of scrutiny." *Roes*, 944 F.3d at 1049 (quoting *Bluetooth*, 654 F.3d at 946). *See also McKinney-Drobnis*, 16 F.4th at 606-07 (reversing approval of class action settlement because district court failed to evaluate *Bluetooth's* three *indicia* of collusion).

Here, the Plaintiffs engaged in no discovery prior to agreeing to the settlement and thus there was not a developed factual basis with which to assess the settlement. There were also *indicia* of collusion because class counsel sought a fee of 28% of the common fund, which is above the 25% benchmark and was not supported by any relevant factor, as the district court found. 1-ER-22.

Plaintiffs' Lead Counsel, who owed a fiduciary duty to the class, also improperly manipulated the plan of allocation to maximize its client LaFrano's payout under the settlement. LaFrano purchased 5,000 shares of LoanDepot stock on February 11, 2021. 6-ER-1097. Under LaFrano's own expert's damages report, ***zero price inflation*** was attributed to this purchase. But under the plan of allocation drafted by LaFrano's lawyers after the settlement was reached, LaFrano got credited with ***$2.29 per share*** of price inflation, as noted in more detail below. But that was not the end of the "special treatment" for LaFrano. Plaintiffs' Counsel utilized its "discretion" to give LaFrano a 25% price inflation bonus. 3-ER-427 ("any Recognized Loss amount greater than zero for any Securities Act Eligible loanDepot Stock ***will then be increased by 25%***."). Since LaFrano's February 11, 2021 stock purchase of 5,000 shares was an eligible

Securities Act claim, he received not only the most amount of price inflation ($2.99 per share), but also the 25% bonus. Because there was no evidentiary basis to support Lead Counsel's departure from the price inflation figures used by its own expert, and because Lead Plaintiff LaFrano clearly benefitted in a material way from the changes, collusion is strongly suggested. "[A] disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983).

The Pomerantz law firm also improperly sought and received a $5,000 "service award" for its "starter client" Adam Doban, who agreed to file an initial complaint for Pomerantz. Even though Doban was never appointed as a Lead Plaintiff, Pomerantz convinced the district court to award $5,000 to Doban, claiming that no one had objected. 1-ER-22–23. But Pomerantz never disclosed to the district court that Doban's own sworn certification, filed with his initial "placeholder complaint," revealed that Doban was an "in and out trader" who had sold all his LoanDepot stock during the Class Period. *See* Ex. 1 to Appellant's Request for Judicial Notice filed contemporaneously (*Doban v. LoanDepot, Inc., et al.*, No. 21-cv-01513 (C.D. Cal.), Dkt. Nos. 1, 1-1, and 1-2).[4] As an in-and-out trader, Doban could never establish loss

---

[4] Doban's certification states that he bought 12,200 shares of LoanDepot stock on April 12, 2021 and sold all 12,200 shares on June 22, 2021, prior to the end of the Class Period. *See* Ex. 1 to Appellant's Request for Judicial Notice filed contemporaneously (*Doban v. LoanDepot, Inc., et al.*, No. 21-cv-01513 (C.D. Cal.), Dkt. Nos. 1-1 and 1-2).

causation and thus was neither an adequate class representative nor entitled to any recovery. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021).[5]

No absent class member could have discerned Doban's in-and-out trader status since the notice sent to class members conveniently omitted this fact, and Doban failed to disclose it in the declaration he submitted to support his $5,000 service award. 2-ER-284–287.[6] And since Doban's complaint was not the first-filed complaint, no pleadings from Doban's copycat complaint were listed in the master docket for this case. As a result, even if an absent class member had engaged in the extremely unusual step of reviewing the docket in this case, they would not have found Doban's complaint or certification revealing that he was an in-and-out trader. Pomerantz took advantage of these facts to secure, through inadequate disclosure to the district court, an unwarranted $5,000 payoff to its client Doban. There could be no more egregious example of the type of collusion the PSLRA was designed to prevent.

Here, class counsel quickly agreed to a $3.5 million settlement of a complex

---

[5] For that reason, the district court also erred in appointing Doban as a class representative. 1-ER-27.

[6] Doban's declaration appears to have been intentionally misleading. Instead of submitting his prior declaration, which noted his trading, he submitted a new declaration which referred to his prior declaration but did not disclose the details of his stock trading. 2-ER-285. Plaintiff LaFrano, on the other hand, simply re-submitted his original declaration. 2-ER-278–282. Lead Counsel's conduct in submitting the original LaFrano declaration but a new declaration from Doban appears to have been calculated to conceal Doban's in-and-out trader status.

securities class action lawsuit which had the effect of dispensing with the need to commit any resources to litigating the merits of the case while at the same time maximizing their own fees and the personal recovery to be received by Plaintiffs LaFrano and Doban. District courts must ensure that class counsel do not "collude with the defendant to strike a quick settlement without devoting substantial resources to the case." *Briseño*, 998 F.3d at 1024. That is exactly what happened here, and the district court failed to apply the requisite heightened scrutiny to the collusive settlement.

Plaintiffs' counsel also negotiated the settlement before it had any written damages report, and thus was ill-informed of the potential recoverable damages at the time it was negotiating the settlement. After Appellant Lako objected to preliminary approval of the settlement based on Plaintiffs' reference to, but failure to submit, a damages declaration, the district court ordered Pomerantz to provide the declaration. *See* 3-ER-537. The District Court's minute order stated:

> Plaintiff Lako filed a Memorandum in Opposition, arguing in part that approval is inappropriate because LaFrano and Doban's Motion relied on an expert declaration regarding damages that they did not file along with their Motion. (Opp., Doc. 113 at 2, 6.) LaFrano and Doban subsequently filed the expert declaration along with their Reply. (Nye Expert Decl., Doc. 114-4.)

*See* 3-ER-537. But Plaintiffs' Counsel did not simply submit the previous "expert declaration" that they had allegedly used to estimate damages when they filed their preliminary approval motion. If they had done so, the declaration would have been dated prior to the date the motion was filed — July 26, 2023. *See* 5-ER948–950. The expert declaration was dated *August 18, 2023* — three weeks after the preliminary

19

approval papers were filed. 4-ER-550–563. Thus, contrary to Plaintiffs' representations to the District Court, there had been no expert report at the time the motion for preliminary approval was submitted.

As demonstrated below, when Plaintiffs' counsel finally obtained a damages report, they manipulated the analysis to make the settlement appear to represent a larger percentage of recovery than was actually the case. This strongly suggests collusion. As the Ninth Circuit has repeatedly recognized:

> "It is well established that class settlements present the unavoidable risk that class counsel might not have adequately represented the interests of absent class members, and it is equally well established that this concern is salient in the pre-certification settlement context. In *Bluetooth*, we recognized that class counsel's self-interest could lead counsel to negotiate a disproportionate share of settlement relief for itself compared to the relief obtained by absent class members. 654 F.3d at 945-46. Given these due process concerns, we must review "a pre-certification settlement approval not only for whether the district court has explored comprehensively all factors, given a reasoned response to all non-frivolous objections, and adequately developed the record to support its final approval decision, but also for whether the district court has looked for and scrutinized any subtle signs that class counsel have allowed pursuit of their own self-interests to infect the negotiations." *Roes*, 944 F.3d at 1043 (cleaned up).

*McKinney-Drobnis*, 16 F.4th at 607. District courts must apply the *Bluetooth* factors in examining pre-certification settlements "to smoke out potential collusion." *Id.*

If this Court concludes that the district court did not adequately consider the *Bluetooth* factors, and therefore did not adequately consider signs of collusion, then it "must vacate and remand the Approval Order [in addition to the attorneys' fee award], so that the court may appropriately factor this into its Rule 23(e) analysis." *Bluetooth*, 654 F.3d at 946.

The Ninth Circuit has also made clear that a district court must assess both the *Staton/Churchill* factors and the *Bluetooth* factors when a settlement agreement is reached pre-certification: "[E]ven a recognition that the substantive claims present a weak case cannot cure a district court's failure to apply the requisite heightened scrutiny to a pre-certification settlement agreement." *McKinney-Drobnis*, 16 F.4th at 609. As noted in *McKinney-Drobnis*: "But we have also held that adequately considering the *Churchill* factors is insufficient if the district court failed to adequately investigate or address the *Bluetooth* factors. Indeed, even where several *Churchill* factors militate towards settlement approval, if 'a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight *Churchill* factors alone is not enough to survive appellate review.'" *McKinney-Drobnis*, 16 F.4th at 609 (citing *Bluetooth*).

Here, the district court paid lip service to the need to analyze the *Bluetooth* factors but did not actually review them, and instead only reviewed the *Churchill/Staton* factors. 1-ER-14. The court simply noted that the *Bluetooth* analysis was required, and then indicated that it had previously *solely* analyzed the *Staton* factors in connection with preliminary approval and that "The Court sees no reason to depart from its previous conclusion as to the above *Staton* factors or the lack of signs of collusion." *Id.* The district court engaged in absolutely no analysis of the *Bluetooth* factors. The *only* analysis the court performed was to state, at the preliminary approval stage, that the court had been told that the settlement was reached through the assistance of a private mediator and thus that there were no *indicia* of collusion: "The Court was also satisfied that there

21

were no signs of collusion between the parties, noting that the Settlement Agreement was the result of a mediation held before a private mediator." *Id.* This did not constitute an analysis of the requisite *Bluetooth* factors because "the mere presence of a neutral mediator, though a factor weighing in favor of a finding of non-collusiveness, is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement." *Bluetooth*, 654 F.3d at 948.

Here, class counsel sought a 28% fee, above the 25% benchmark. 1-ER-17. This constituted a sign of collusion — class counsel was attempting to maximize its own self-interest in a way that would inure to the detriment of the class, since any fees awarded reduce the class members' recovery. The fact that the district court ultimately awarded less than the requested fees (awarding 25%, not 28%) does not detract from the analysis and in fact proves the point. The district court determined that the requested 28% fee was not warranted or justified. 1-ER-17–22. The fact that class counsel sought an upward adjustment under circumstances where they had performed no discovery and no work on the case other than partially surviving a motion to dismiss demonstrates that class counsel was seeking to maximize its own fees at the expense of the Class. Plaintiffs' counsel offered absolutely no basis for the requested upward adjustment, and there was none. And it is no answer to say that the district court properly reduced the requested fee and thus did its job. The district court's failure was its refusal to engage in any substantive analysis of the *Bluetooth* factors. It recognized that the requested fee was unwarranted under every single relevant factor. *See* 1-ER-22

22

("The *Vizcaino* factors do not warrant an upward departure from the 25% benchmark that the Ninth Circuit has set for common-fund cases, and the lodestar cross-check further supports adhering to that benchmark."). But instead of simply reducing the requested fee, the court was required to recognize that there were several red flags that were *indicia* of collusion and thus to analyze the *Bluetooth* factors. It failed to do so.

The other signs of collusion that the district court failed to analyze under *Bluetooth* included the fact that the class notice did not contain any disclosure regarding the maximum potential recoverable damages, thus preventing absent class members from properly analyzing whether to object or opt out of the settlement. Second, as set forth in detail below, in its submissions to the district court, class counsel manipulated the damages analysis to exclude damages from a statistically significant stock drop, thus artificially reducing the estimated damages. 4-ER-550–563. Third, as previously noted, Plaintiff Doban received a $5,000 service award even though he was not a lead plaintiff, performed no discernible work, and did not even have a cognizable claim since he was an in-and-out trader. The notice did not disclose these material facts.

The district court acknowledged that it could not adequately assess the settlement without accurate and reliable information about the potential maximum recoverable damages. *See* 3-ER-497 (Reporter's Transcript from 12/8/23 hearing, at p. 9:5-11 ("I cannot judge the reasonableness of the settlement unless I have a potential maximum exposure and look at it as sort of a percentage of that and compare it to what is typical in securities class actions. And I cannot independently judge the maximum possible

23

settlement or potential settlement without expert testimony, expert declarations, information like that in a case like this.")).  Yet no damages report was filed with the original motion for preliminary approval and then, when it was belatedly filed, it contained glaring errors and deficiencies and was penned by an expert whose opinions have previously been disallowed under *Daubert*.  *See, e.g.*, *In re Ocwen Fin. Corp. Sec. Litig.*, 2017 U.S. Dist. LEXIS 236564, at *16 (S.D. Fla. June 21, 2017) (excluding a portion of the opinions of Dr. Nye, stating: "This corrective disclosure does not relate to any of the misstatements at issue in this case.  The conjecture and inferences drawn by Nye are not allowed by the law related to corrective disclosures.  Testimony related to this corrective disclosure is not relevant and therefore inadmissible.  At trial, Plaintiffs are precluded from offering evidence based on the November 13, 2014 corrective disclosure.").

## II.   Plaintiffs' Damages Report, When Finally Generated and Submitted, Wrongfully Omitted Significant Damages and Was Unreliable

The most glaring defects in the Plaintiffs' *post-hoc* expert report were: (1) the report's failure to calculate all relevant damages and instead to make unreasonable (and in some cases undisclosed) assumptions in order to arrive at an artificially reduced damages figure; and (2) the report's use of a "price inflation maintenance" theory to calculate damages even though such theory was not pled by the Plaintiffs.  Plaintiffs' expert was Dr. Zachary Nye.

After Dr. Nye submitted his damages report, Appellant Lako pointed out some

of the glaring errors of the report to the district court. 4-ER-698–707; 696–697. In response, Plaintiffs submitted a "supplemental" declaration from Nye in which he provided additional details and calculations which resulted in higher damages numbers. For example, in his supplemental declaration, Dr. Nye admitted that in his original damages report, "I limit[ed] my analysis of aggregate damages under Section 11 to shares purchased during the period from the February 11, 2021 IPO through March 15, 2021 (*i.e.*, the period prior to the Section 10(b) Damage Period)." 3-ER-523. ***Once Nye fixed his report to include the entire Class Period, he identified an additional $56.2 million in damages for the Section 11 claim alone***. 3-ER-524. Nye's calculation of the total potential recoverable damages for the Section 11 claim increased from just $0.67 million in his first report (4-ER-563) to $56.79 million in his supplemental expert report submitted three months later on November 10, 2023. 3-ER-524.[7] Nye's explanation for not including those figures in his initial report to the court was that there was an early release of some "lock up agreement" shares on May 17, 2021 and thus that persons who bought after this date might have trouble "tracing" their shares and thus not be able to "prove" their Section 11 claim. 3-ER-522–523. Of course, all class members might have trouble "proving" their claims at trial if the case did not settle. That does not constitute a basis to totally exclude the damages

---

[7] These figures refer to the damages numbers under what Nye calls the "One-Trader Model." Total Section 11 damages under the Two-Trader model increased to $47.36 million.

calculations for a significant portion of the class period alleged in Plaintiffs' complaint.[8] Nye not only totally excluded these significant damages from his initial damages report submitted to the court, but never disclosed to the court that he did so, nor the alleged basis for doing so. It was only after Appellant Lako objected to the report that the additional assumptions and calculations were provided by Nye in his November 10, 2023 "supplemental" declaration.

The true picture of total potential recoverable damages for the Section 11 claim, as newly revealed in Nye's supplemental declaration, sheds significant light on the unfairness of the settlement. As noted *supra*, that supplemental report showed the total Section 11 damages to be $56.79 million. 3-ER-524. Statistical analysis of securities class action settlements demonstrates that where, as here, potential Section 11 damages are less than $50 million, a much higher percentage of simple statutory damages is typically recovered than in those cases where damages exceed $50 million. *See* Cornerstone's 2022 REVIEW AND ANALYSIS, SECURITIES CLASS ACTION

---

[8] Even if Nye's supposed concern about the potential difficulties of "tracing" for persons who bought on or after May 17, 2021 were credited and those damages were completely excluded, his damages calculation for the Section 11 claim still increased by another $10.75 million from his first report to his supplemental report since he had previously excluded all damages from the 3/16/21 to 5/14/21 period. 3-ER-524.

SETTLEMENTS.[9]  As Cornerstone's report demonstrates,[10] Section 11 claims where damages are less than $50 million settle for approximately 24.2% of statutory damages on average, much higher than those cases where damages exceed $150 million, where the median recovery is just 4.6% of damages.  **_Here, an average settlement based on the full Section 11 damages of $56.79 million would have been $13.74 million_** — significantly higher than the modest $3.5 million obtained by the Lead Plaintiff.  These facts underscore the manipulation of the damages figures by the Lead Plaintiff and his counsel.

Instead of disclosing all relevant facts regarding the potential recoverable damages to the district court, the Lead Plaintiff represented that the recovery of $3.5 million represented an excellent recovery because it was supposedly 11% of maximum recoverable damages.  _See_ 5-ER-935.  Even after Lako pointed out the inaccuracy of the Lead Plaintiff's submissions, however, the district court rubber-stamped the inadequate settlement, refusing to apply heightened scrutiny.

In addition, Nye's calculation of damages for the Section 10(b) claim suffered from similar defects.  Nye's report excluded damages from the single largest stock drop alleged in Plaintiffs' complaint.  Plaintiffs' complaint alleged that LoanDepot's stock

---

[9] _Available at_ https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf (last visited Oct. 11, 2024).

[10] _See id._ at 8.

*dropped 22%* on May 10, 2021 after "the Company filed the 1Q21 10-Q. The 10-Q revealed that the Company had recognized $4.3 million in realized loan losses in connection with its loan repurchase reserves, versus only $1.6 million in the first quarter of 2020." 6-ER-1058–1059. The complaint alleges that "In response, LoanDepot's stock price continued to fall, closing at $13.70 on May 10 and falling to $12.10 at the close of trading on May 13, 2021 — a more than 22% decline from the May 10 opening price to the May 13 closing price." 6-ER-1059.

The 22% stock drop was obviously highly material and accounted for a large portion of the damages. Dr. Nye's report calculated that there was at least $2.99 of price inflation on May 10, 2021 prior to the stock drop that day. 4-ER-557. In all, Dr. Nye identified $7.28 per share of price inflation during the Class Period, and yet only included $0.92 of price inflation in his ultimate damages calculation, which he dubbed "Scenario 2." Under "Scenario 2," *Dr. Nye excluded all damages except the small $0.92 per share associated with LoanDepot's stock drop on a single day — August 3, 2021.* 4-ER-556. Dr. Nye's report and declaration states that "*I have been asked to calculate damages under an alternative price inflation scenario that is based solely on the Company-specific decline on August 3, 2021 (i.e., $0.92).*" *Id.* (emphasis added). Thus, Dr. Nye stated that Lead Plaintiff's counsel — Pomerantz LLP — asked him to put together a "Scenario 2" damages model that excluded all damages other than those on a single day — August 3, 2021. Thus, Plaintiffs' counsel asked Nye, and Nye agreed, to exclude all the other damages noted in "Scenario 1,"

which had resulted in a calculation of $7.28 per share in total price inflation. 4-ER-555–557. Based on the manipulations and limitations requested by Plaintiffs' counsel, Dr. Nye reduced damages for the Section 10(b) claim from $31.89 million to just $7.29 million. 4-ER-562.

Dr. Nye stated that he used an event study to exclude damages associated with disclosures that he claimed were not within a 90% confidence level. Yet he still excluded two price decline days that were statistically significant at or near the 90% level — May 7, 2021 and May 10, 2021. The May 7, 2021 price decline was associated with a 99.8% confidence level and the May 10, 2021 decline was associated with an 88.9% confidence level. While the May 10, 2021 decline was technically 1% below the 90% confidence threshold, the Company's stock declined 22% on that day in direct response to LoanDepot's disclosure that it had "recognized $4.3 million in realized loan losses in connection with its loan repurchase reserves, versus only $1.6 million in the first quarter of 2020." 6-ER-1058–1059. And the Lead Plaintiff had relied on that allegation for the sufficiency of his "loss causation" argument, which the district court had upheld at the motion to dismiss stage. 5-ER-982 ("Here, Plaintiffs have alleged a sufficient causal connection between the fraud and the drop in stock prices to show proximate causation at this stage."). It was thus improper for Nye to exclude damages from the major 22% drop on May 10, 2021.

In addition to these discrepancies and deficiencies, Dr. Nye's report was fundamentally infirm in that it calculated damages using a "price inflation maintenance"

29

methodology despite the fact that Plaintiffs' complaint does not allege that any of the false statements caused any artificial inflation in LoanDepot's stock during the Class Period or that any artificial inflation existed prior to the start of the class period. Under such circumstances, courts in the Ninth Circuit have held that a damages report cannot be relied upon. *See, e.g., In re Finisar Corp. Sec. Litig.*, 2019 U.S. Dist. LEXIS 88205, at *11 (N.D. Cal. May 24, 2019) ("the court found that the December 2nd statement had been made after the stock price had already increased from the previous day's close; the report of Defendants' expert, Alexander Aganin, was persuasive and the December 2nd statement did not cause the stock price to increase when the statement was made; that Plaintiff had not alleged that the stock price was artificially high at the time of the Gertel's statement, and therefore the price maintenance theory was inapplicable."). It is not surprising, then, that Dr. Nye's opinions have been stricken by other courts for failure to comport with *Daubert*. *See, e.g., Ocwen*, 2017 U.S. Dist. LEXIS 236564, at *16 (excluding two opinions of Dr. Nye related to corrective disclosures in a securities class action).[11] The opinions of Dr. Nye stricken in *Ocwen* are relevant here because in both instances Dr. Nye was trying to show price impact and damages through corrective disclosures rather than attempting to show price inflation on the "front-end" at the time

---

[11] *See also United States ex rel. Morsell v. Nortonlifelock, Inc.*, 567 F. Supp. 3d 248, 282 (D.D.C. 2021) ("The Court will therefore not exclude Nye's testimony on this ground but is likely to view Nye's estimates that include the 10% markup with skepticism.").

of allegedly false statements.

Here, there is not a single allegation in Plaintiffs' complaint that any of the allegedly false statements made by Defendants caused a material increase in LoanDepot's stock price. *See* 6-ER-992–1077. As such, in order to rely on a damages model predicated on a "price inflation maintenance" theory, Plaintiffs' complaint would have to allege that LoanDepot's stock price was artificially inflated prior to the start of the Class Period and that the false statements during the Class Period "maintained" the price inflation. But there are no such allegations in the complaint, and thus damages cannot be calculated based on a price maintenance theory. *Finisar*, 2019 U.S. Dist. LEXIS 88205, at *19 ("There are no allegations in the Complaint suggesting that Finisar's stock was inflated before the December 2nd statement."); *id.* at *10 (court agreed with defendants' argument "that Gertel's statement did not have an impact on Finisar's stock price at the time the statement was made; and (b) that price impact cannot be inferred from the stock price drop after the purported 'corrective disclosure' on March 8 because there was no pre-existing price inflation, *i.e.* the 'price maintenance' theory was inapplicable.").

Here, Dr. Nye's expert report calculated damages exclusively pursuant to a "price maintenance" theory. 4-ER-554–555. Dr. Nye specifically stated that he was attempting to measure "the dissipation of price inflation created by earlier misrepresentations" and cited *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016), which is a seminal case approving a "price maintenance" approach to measuring price

impact. *Id.*

Because Plaintiffs did not allege a valid "price maintenance" theory of damages and because Dr. Nye's report relied exclusively on that theory to estimate damages, Nye's damages report does not comport with *Daubert*, *Comcast*, or *Dura*. The Ninth Circuit has interpreted *Comcast* to demand that plaintiffs "'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Hatamian v. Advanced Micro Devices, Inc.*, 2016 U.S. Dist. LEXIS 34150, at *24 (N.D. Cal. Mar. 16, 2016) (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 569 U.S. at 38). In *Comcast*, the Supreme Court held that "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast*, 569 U.S. at 38 (internal quotation marks omitted). In *Comcast*, the Supreme Court reversed an order granting class certification because the plaintiffs relied on a regression model that "did not isolate damages resulting from any one theory of antitrust impact." *Id.* at 32. The Court concluded that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* at 35.

Dr. Nye's damages report does not comply with these standards because it relies exclusively on a "price maintenance" theory that Plaintiffs did not plead. Dr. Nye's report was thus inconsistent with the Plaintiffs' theory of liability and necessarily resulted in a distorted and unreliable damages estimation.

### III. Reversal is Also Required Because the Plan of Allocation Is Arbitrary, Contrary to the Conclusions of Plaintiffs' Own Expert, and Afflicted by Self-Interest

The district court's order approving the plan of allocation also constituted error. This Court reviews a plan of allocation based on the same standard as the settlement itself — whether it is fair, reasonable and adequate. *See Class Plaintiffs*, 955 F.2d at 1284.

The plan of allocation was not fair, reasonable and adequate because it was arbitrary and utilized completely different amounts of price inflation than the figures contained in Dr. Nye's damages analysis.

Plaintiffs formulated a plan of allocation for the Class's recovery that assumed different amounts of price inflation during the Class Period, including inflation of as much as ***$2.29 per share*** from February 11, 2021 to March 16, 2021. 3-ER-423–424. This was completely different from Nye's report, which calculated ***zero price inflation*** during this period, and only $0.92 per share after March 16, 2021. 4-ER-557.[12] *See also id.* at 4-ER-556 ("August 3, 2021 is the only alleged corrective event with a Company-specific return that is statistically significant at above the 90% confidence level on the first impact date following the disclosure. ***Thus, I have been asked to calculate damages under an alternative price inflation scenario that is based solely on the Company-specific decline on August 3, 2021 (i.e., $0.92).***") (emphasis added).

---

[12] These figures correspond to what Nye called his "Price Inflation Scenario 2," which served as the basis for his damages calculations.

Nye's severe limitation of the calculation of damages to just $0.92 per share was thus based explicitly on his purported finding that there was one and only one statistically significant "corrective disclosure" — on August 3, 2021.

But after taking advantage of Nye's material truncation of damages to arrive at a figure that would make the small $3.5 million settlement look better, Class Counsel did an about face and formulated a plan of allocation that assumed multiple material "corrective disclosures" and significantly different amounts of price inflation during the Class Period. The notice sent to Class Members stated that there were five material Corrective Disclosures and, based on that, broke the Class Period up into five different time periods. In addition to the August 3, 2021 corrective disclosure that Nye said was the "only" statistically significant disclosure, Plaintiffs added four others: March 17, 2021; May 3, 2021; May 11, 2021; and September 23, 2021. 3-ER-423. The Notice told Class Members that "The estimated alleged artificial inflation in the price of LoanDepot Stock during the period from the IPO through the end of the Class Period is reflected in Table 1 below." *Id.* Table 1 in the Notice is set forth below:

| Table 1 Artificial Inflation in loanDepot Stock | | |
|---|---|---|
| **From** | **To** | **Per-Share Price Inflation** |
| February 11, 2021 | March 16, 2021 | $2.29 |
| March 17, 2021 | May 2, 2021 | $2.11 |
| May 3, 2021 | May 10, 2021 | $1.43 |
| May 11, 2021 | August 2, 2021 | $1.15 |
| August 3, 2021 | September 22, 2021 | $0.23 |
| September 23, 2021 | Thereafter | $0.00 |

34

Simply put, the Plan of Allocation was totally arbitrary and was contrary to the conclusions of Plaintiffs' own expert. **Dr. Nye specifically concluded that there was no price inflation in LoanDepot's stock between February 11, 2021 and March 16, 2021.** His report stated that "my analysis of per-share damages assumes that artificial inflation in the price of LoanDepot stock was introduced after market close on March 16, 2021 . . . and dissipated only when the alleged corrective information came to light." 4-ER-556–557. Despite Nye's findings and conclusions, Lead Plaintiff's Counsel unilaterally and arbitrarily ascribed $2.29 in price inflation to LoanDepot's stock during the time when Nye said there was **no** price inflation. Based on this transmogrification, the Plan of Allocation allows Class Members who bought stock between February 11, 2021 and March 16, 2021 to not only receive payments under the proposed settlement, but in fact to receive the highest amount of allotted price inflation — $2.29 per share. The Notice stated: "LoanDepot Stock acquired directly from an underwriter or its agent in LoanDepot's IPO shall be treated as a purchase of shares at a price of $14.00 per share (*i.e.*, the IPO offering price) with per-share price inflation of $2.29." 3-ER-424.

The Plan of Allocation's treatment of shares purchased after August 3, 2021 is likewise completely the opposite of the conclusions of Dr. Nye. While Nye concluded there was **zero** price inflation after August 2, 2021 (4-ER-557), Plaintiffs' Counsel took it upon themselves to provide for **$0.23 of price inflation** in the Plan of Allocation for shares bought between August 3, 2021 and September 22, 2021. *See supra*, 3-ER-424.

35

The stark contrasts in the damages/price inflation calculations in Dr. Nye's report and the damages/price inflation figures used by Lead Plaintiff's Counsel in the plan of allocation are summarized below:

| Alleged Price Inflation | | Nye Expert Report | Plaintiffs' Plan of Allocation |
|---|---|---|---|
| 2/11/21 – 3/16/21 | | $0 | $2.29 |
| 3/17/21 – 5/2/21 | | $0.92 | $2.11 |
| 5/03/21 – 5/10/21 | | $0.92 | $1.43 |
| 5/11/21 – 8/02/21 | | $0.92 | $1.15 |
| 08/03/21 – 09/22/21 | | $0 | $0.23 |

Given these stark differences between the plan of allocation and the conclusions of Plaintiffs' own expert, it is clear that the plan of allocation is totally arbitrary and capricious. When they wanted to try to make the $3.5 million settlement look decent in comparison to the alleged "potential recoverable damages," the Lead Plaintiff's Counsel instructed Nye to utilize arbitrary assumptions that would make the potential recoverable damages look small. But then when it came time to draft the plan of allocation, Class Counsel jettisoned Nye's conclusions and used amounts of price inflation that were directly contradictory to Nye's calculations.

Because the amounts of price inflation utilized in the plan of allocation were directly predicated on the stock's decrease on the five Corrective Disclosures hand-

picked by Class Counsel (3-ER-423), and because Nye concluded that only one of those Corrective Disclosures (August 3, 2021) was statistically significant, the plan of allocation is fundamentally flawed and contrary to Plaintiffs' own expert report. The Notice itself stated that "In order to have recoverable damages in the Action, disclosures correcting the alleged misrepresentations must be the cause of the decline in the price of the LoanDepot Stock." *Id.* Yet the plan of allocation permits class members to obtain a recovery even if their alleged loss was caused by a corrective disclosure other than the August 3, 2021 corrective disclosure that Nye determined is the only statistically significant disclosure.

In this regard, the plan of allocation and Nye's report suffer from the same defects that caused the court to exclude Nye's opinions about two corrective disclosures in *Ocwen*, 2017 U.S. Dist. LEXIS 236564, at *16 (excluding two opinions of Dr. Nye related to corrective disclosures in a securities class action). The only difference is that in *Ocwen*, Dr. Nye included unwarranted opinions about corrective disclosures and then had two of his opinions stricken. Here, Nye excluded four out of five corrective disclosures from his report, but then Plaintiffs' Lead Counsel nonetheless went ahead and premised payments to class members in the plan of allocation on four corrective disclosures that Nye refused to vouch for. If there was insufficient evidence to support adding the damages resulting from the four corrective disclosures to Nye's calculation of damages, then there was insufficient evidence or basis for Class Counsel to use four out of five of the corrective disclosures to allocate the settlement consideration among

37

class members.[13]

Because the plan of allocation here was totally arbitrary and not related in any way to the actual amount of price inflation, it did not warrant approval. "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable. It is also reasonable to allocate more of the settlement to class members with stronger claims on the merits." *In re Oracle Sec. Litig.*, 1994 U.S. Dist. LEXIS 21593, at *1 (N.D. Cal. June 16, 1994) (citing *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992)).[14] In *Oracle*, the plan of allocation was approved because the plaintiffs had submitted detailed evidence and information distinguishing the strength of the merits of different claims in the case. *See id.*, 1994 U.S. Dist. LEXIS 21593, at **5-6 ("Class plaintiffs' analysis of the relative merits of each sub-class' claims is thorough, insightful and substantially comports with the court's view of these cases. For each sub-class, class plaintiffs analyze defendants' alleged misconduct, the weight of evidence supporting the claims of the subclass, the practical difficulties of proving those claims at trial and the strength of any applicable defenses

---

[13] Significantly, none of the four came even close to meeting the 90% significance level which Nye said should be met: the March 17, 2021 disclosure only had a 19.7% significance level, the May 11, 2021 disclosure was only 44.4%, the September 23, 2021 disclosure was only 66.4%, and the May 3, 2021 disclosure was only 68.5%. 4-ER-555–556.

[14] *See also In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555, at *38 (C.D. Cal. June 10, 2005).

(*e.g.*, the truth on the market defense) . . . The percentages of recovery assigned to each sub-period are reasonably calculated to allow class members with more meritorious claims to recover a correspondingly larger portion of the settlement."). Here, in contrast, the Plaintiffs did not submit, and the district court did not review, any evidence or facts supporting the arbitrary allocation of different amounts of price inflation during the Class Period. Instead, the district court simply blindly deferred to Plaintiffs' Counsel's discretion to allocate different amounts of price inflation. *See* 1-ER-16–17 (stating that "class counsel are entitled to 'make[] interclass distinctions based upon, inter alia, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue.'"). In this regard, the district court did not cite to any evidence that class counsel had submitted to substantiate the merits of one set of claims versus another or to substantiate allocating different amounts of price inflation to different sub-periods within the Class Period, but simply quoted a sentence from another case stating that class counsel has discretion so long as the discretion is exercised after gathering evidence to support the exercise of such discretion. Here, because class counsel failed to submit any evidence to support the artificial allocations set forth in the plan of allocation, and because such allocations contradicted the amounts of price inflation set forth in their own expert's damages report, class counsel did not exercise its supposed discretion in good faith and the district court's approval of the plan of allocation lacked an adequate evidentiary basis.

In addition to the fact that the Plan of Allocation is unsupported and contrary to

the Nye report, its arbitrary allocation of the largest amount of price inflation to the beginning of the Class Period, when Nye said there was zero price inflation, appears to be a self-interested manipulation. Lead Plaintiff LaFrano just happens to have purchased 5,000 shares of LoanDepot stock on February 11, 2021. 6-ER-1097. Under Nye's damages report, zero price inflation was attributed to this purchase. But under the Plan of Allocation drafted by LaFrano's lawyers, LaFrano gets credited with $2.29 of price inflation, as noted *supra*. Such machinations are hardly consistent with the fiduciary duties owed by LaFrano to his fellow class members. "[A] disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class." *Holmes*, 706 F.2d at 1148. Courts have refused to approve settlements on the ground that a disparity in benefits evidenced either substantive unfairness or inadequate representation. *See, e.g., Franks v. Kroger Co.*, 649 F.2d 1216, 1226 (6th Cir. 1981) (reversing district court's approval of settlement when "the 'preferred position' of the named plaintiffs should have signaled the district court of potential inequities in this proposed settlement"); *Plummer v. Chemical Bank*, 91 F.R.D. 434, 442 (S.D.N.Y. 1981) ("such disparities must be regarded as *prima facie* evidence that the settlement is unfair to the class, and a heavy burden falls on those who seek approval of such a settlement") (citations omitted). Settlements entailing disproportionately greater benefits to named parties are proper only when the totality of circumstances combine to dispel the "cloud of collusion which such a settlement suggests." *Women's Committee for Equal Employment Opportunity v.*

40

*National Broadcasting Co.*, 76 F.R.D. 173, 182 (S.D.N.Y. 1977).

Finally, even if these blatant defects were not enough to warrant reversal, the Plan of Allocation would still be defective due to its failure to advise absent class members of any facts whatsoever about how the Plan of Allocation differed in markedly material ways from the conclusions of Dr. Nye regarding the amounts of price inflation during the Class Period.

## IV. The Court Should Reverse Because the Notice Sent to Absent Class Members Did Not Comply With Due Process Requirements and the PSLRA

Because the adequacy of the notice sent to absent class members is antecedent to the merits of the settlement, this Court should consider the notice issue first. *See, e.g., Veritas*, 496 F.3d at 968; *In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003) ("A decision that notice is appropriate is required before any inquiry is made into the merits of the settlement itself.").

The PSLRA requires that every settlement notice must include a statement of plaintiff's recovery: "The amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis." 15 U.S.C. § 78u-4(a)(7)(A). The notice must also include a statement of "the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged." 15 U.S.C. § 78u-4(a)(7)(B).

It is clear that the purpose of the notice requirement is to allow class members to evaluate a proposed settlement. *Veritas*, 496 F.3d at 969. With sufficient notice, class

41

members can compare the recovery per share under the settlement with the potential damages per share if the class prevailed at trial and weigh the risks and rewards of proceeding to trial or participating in the proposed settlement. The Conference Committee Report notes that the PSLRA requires improved settlement notices to class members because "[c]lass members often receive insufficient notice of the terms of a proposed settlement and, thus, have no basis to evaluate the settlement." H.R. Rep. No. 104-369, at 36 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 735. Ninth Circuit cases have noted this purpose. *See, e.g.*, *Veritas*, 496 F.3d at 969.[15]

In this case, as noted *supra*, the notice did not provide information about the potential recoverable damages and did not disclose that the allocation of price inflation to different time periods within the Class Period was materially different than the uniform $0.92 per share price inflation allocated by Plaintiffs' expert Dr. Nye throughout the Class Period. These deficiencies alone made the notice defective.

In addition, the notice stated:

> "At this time, **it is not possible to make any determination as to how much individual Settlement Class Members may receive from the Settlement**."

*See* 3-ER-422. Yet the notice also stated that "Assuming all potential Settlement Class

---

[15] Courts outside the Ninth Circuit have also done so. Several courts have noted this purpose in *dicta*. *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 184 (S.D.N.Y. 2003) ("One of the concerns Congress had in enacting the PSLRA was to ensure that class members received sufficient, comprehensible notice so they could evaluate proposed settlements intelligently.").

Members elect to participate, the estimated average recovery is $0.37 per damaged share before the deduction of fees and expenses." 3-ER-414. Telling absent class members that "the estimated average recovery is $0.37 per damaged share" in one part of the Notice and then later telling them that "it is not possible to make any determination as to how much individual Settlement Class Members may receive" is inherently contradictory and confusing. The notice was thus inadequate and defective.

Even worse, nowhere in the notice were absent class members told anything about the potential recoverable damages had the case been litigated instead of quickly settled, with no discovery taken, after the Plaintiffs survived a motion to dismiss. Appellees may attempt to argue they were not required to disclose this amount, but such argument would be unavailing. Appellees affirmatively chose to disclose the fact that there was a risk that nothing might be recovered but-for the settlement:

> "If there were no Settlement and Plaintiffs failed to establish any essential legal or factual element of the alleged claims, neither Plaintiffs nor the Settlement Class would recover anything from Defendants."

3-ER-421. The obvious intent of raising the specter of "no recovery" was to try to make the meager $3.5 million settlement look better. But having chosen to inform absent class members that they might get nothing if the settlement did not receive approval and Plaintiffs were forced to litigate their claims and thereafter "failed to establish any essential legal or factual element of their claims," Appellees were obligated to inform absent class members what might have been recovered had

43

Plaintiffs been successful and prevailed on their claims at trial. They did not. As a result, the notice contained only a classic half-truth. Concealment of the potential recovery made disclosure of the prospect of "no recovery" inherently misleading. The U.S. Supreme Court recently confirmed that under the federal securities laws, when a person chooses to speak about a topic, important additional facts cannot be concealed or omitted in such a manner as to make the statement misleading. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024). Class Counsel should not be able to skirt the very obligations of the laws they sue under when communicating with the class members.

Appellant pointed out the defect before the notice went out, noting that in the motion for preliminary approval the Plaintiffs had referenced a figure for a potential recovery yet had not submitted any expert damages report to the court. 4-ER-698–707; 3-ER-530–536. In response to Appellant's concerns, Plaintiffs submitted a report that **was dated after the date of the preliminary approval motion**, thus demonstrating that the report did not exist before Appellant requested that it be provided. In their sur-reply in support of the preliminary approval motion (3-ER-508), Plaintiffs backpedaled and said that they never claimed to have had a damages expert but instead merely claimed to have had an expert "estimate classwide damages." 3-ER-509. Thus, Plaintiffs conceded that at the time they submitted the Motion for Preliminary Approval they had no written damages report and that Dr. Nye had only apparently done some type of rudimentary calculation of damages which was not contained in any written

report. The Plaintiffs never advised the district court when the expert allegedly performed an "informal" damages estimation. Plaintiffs also conceded that the Nye report later submitted to the Court in response to Mr. Lako's objection was the first written report prepared by Dr. Nye and was not "dated, signed, and filed" until August 18, 2023. *Id.*

The available record thus demonstrates, at a minimum, that Plaintiffs' Lead Counsel had no written damages report when they negotiated the settlement. They may not have even had an informal, unwritten estimate.

Because the damages report was eventually submitted to the court, details regarding the potential recoverable damages should have been provided in the notice disseminated to class members. But it was not — the notice sent to class members provided absolutely no information about the potential recoverable damages.

In addition, the details in the damages report suggested collusion and/or manipulation of the damages figure. As noted *supra*, the plaintiffs' damages calculations and plan of allocation completely excluded the largest stock drop on May 10, 2021 — a 22% drop on a day during the Class Period where the Plaintiffs allege there was a material misrepresentation by Defendants. 6-ER-1058–1059. This constituted a manipulation of the damages figures downward in order to attempt to make the meager settlement look better. No legitimate explanation was provided by Appellees for excluding the damages from this date. And yet when it came time to draft the Plan of Allocation, Plaintiffs' Counsel utilized all the alleged corrective disclosures to arbitrarily

allocate price inflation among class members, despite the fact that Dr. Nye said four out of the five disclosures were not statistically significant. Indeed, none of the four came even close to meeting the 90% significance level which Nye said should be met: the March 17, 2021 disclosure only had a 19.7% significance level, the May 11, 2021 disclosure was only 44.4%, the September 23, 2021 disclosure was only 66.4%, and the May 3, 2021 disclosure was only 68.5%. 4-ER-555–556.

As also noted *supra*, Plaintiffs' damages report was inherently unreliable and inadmissible because it exclusively utilized a "price maintenance" theory to show price impact and damages. Because that theory was never pled by Plaintiffs, Dr. Nye's report did not match Plaintiffs' theory of liability and thus did not accurately estimate damages. Plaintiffs were required to "'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Hatamian*, 2016 U.S. Dist. LEXIS 34150, at *24 (citing *Leyva*, 716 F.3d at 514) (citing *Comcast*, 569 U.S. at 38). In *Comcast*, the Supreme Court held that "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast*, 569 U.S. at 38 (internal quotation marks omitted). Dr. Nye's report never complied with that first step.

Because the Notice did not disclose that the Plaintiffs had excluded significant damages, and did not disclose fundamental assumptions including the fact that the damages were estimated based on a "price maintenance" theory that Plaintiffs never alleged, it was defective. The PSLRA's purpose of allowing class members to evaluate

46

a proposed settlement would be frustrated if lead plaintiffs could apply undisclosed assumptions to their estimated average recovery per share. *Veritas*, 496 F.3d at 971. That is what happened here — Plaintiffs sought approval of the settlement from the District Court through a defective damages analysis that was initially not disclosed to the court, and then once disclosed at Appellant's urging, employed a material assumption that no damages existed for one of the key days of the Class Period. That assumption, though ultimately disclosed to the court, was never disclosed to class members anywhere in the Notice. In addition, though the Nye report determined that only one of five corrective disclosures were statistically significant enough to serve as the basis of damages, the Plan of Allocation utilizes all five corrective disclosures to allocate the settlement consideration, even though the other four were all far below the 90% necessary threshold. These facts were also concealed in the notice.

As noted by the Ninth Circuit in a similar circumstance:

> The absence of adequate notice injects a fatal flaw into the entire settlement process and undermines the district court's analysis of the fairness of the settlement under the *Hanlon* factors. While the district court has substantial discretion in approving the details of a class action settlement, it may not do so without giving class members an adequate opportunity to object. In this case, where the notice was inadequate and overstated the likely recovery per share, it may have discouraged other objectors from speaking up. The fact that there was only one objector to the substantive terms of the settlement—a fact that the district court made much of—carries little weight in light of the inadequacy of the notice. Because the revised notice of proposed settlement was inadequate under the PSLRA, we vacate the judgment of the district court approving the settlement and plan of allocation and remand to issue a new notice to the class.

*Veritas*, 496 F.3d at 972.

**V.  The Court Should Reverse Because Plaintiffs Failed to Comply with the District Court's Directive to Submit a Sufficient Number of Declarations From Absent Class Members to Allow the Court to Assess the Class's Reaction to the Proposed Settlement**

The reaction of absent class members is an important consideration in assessing the fairness and reasonableness of a proposed settlement. *See Bluetooth*, 654 F.3d at 946. For this reason, the district court ordered Plaintiffs' Lead Counsel to submit a sufficiently numerous number of declarations from absent class members providing their reactions and opinions to the proposed settlement. 1-ER-55.  In response, Lead Counsel ignored this directive and only submitted declarations from the two of the three plaintiffs. 2-ER-278–287.  The two plaintiffs are, by definition, not absent class members because they are named parties before the court.  Thus, Lead Counsel initially submitted zero declarations from absent class members, as they conceded.  After Appellant Lako's initial objections were upheld in part and the district court ordered Lead Counsel to submit additional counsel declarations and a revised notice packet, Lead Counsel filed a supplemental declaration in further support of their motion for preliminary approval. 3-ER-375–488.  Subsequently, in the declaration in support of their final approval motion, Lead Counsel again conceded that they had failed to comply with the district court's order to submit a sufficient number of declarations from absent class members, and then stated that they were only submitting one declaration from an absent class member, who they said was the spouse of Plaintiff Doban:

48

> The Court previously directed Class Counsel "to submit a sufficient number of declarations from Class Members discussing their reactions to the Settlement Agreement." ECF No. 126 at 19. Class Counsel has already submitted declarations from Plaintiffs LaFrano and Doban explaining their support for the Settlement. See ECF Nos. 137-4 (LaFrano) and 137-5 (Doban). Class Counsel also submits herewith one additional declaration from a Settlement Class Member expressing support for the Settlement. *See* Supp. Park. Decl., Ex. 4. Class Counsel notes for the sake of transparency that this Settlement Class Member is the spouse of Plaintiff Doban. Because Class Counsel does not have an attorney-client relationship with other members of the Settlement Class, and given the reluctance of Settlement Class Members to have their name on public filings—a concern expressed to Class Counsel by two separate Settlement Class Members who contacted Class Counsel with questions about the Settlement—Class Counsel was not able to secure declarations from other members of the Settlement Class.

*See* 2-ER–118. Thus, even after being given two different opportunities to comply with the district court's order to submit a sufficient number of declarations from class members, Lead Counsel failed to do so. Instead, they only submitted a single declaration from the spouse of one of the two plaintiffs. By their own admission, they failed to comply with the district court's order.

The district court, however, imposed no consequences on Lead Counsel's failure to comply with its order. The failure to comply resulted in a lack of information regarding the class members' reaction to the proposed settlement. The district court therefore should not have approved the settlement and should have required compliance with its order prior to ruling on the motion. This constitutes an additional ground for reversal.

## CONCLUSION

For all the foregoing reasons, the Court should reverse the approval of the class action settlement and remand for further proceedings with an instruction to remove Pomerantz LLP as Class Counsel due to its failure to safeguard the interests of absent Class Members as set forth above. *See* FED. R. CIV. P. 23(g)(2) (permitting "consider[ation of] any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class"); *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (recognizing the court's "broad discretion" under Rule 23).

Dated: October 15, 2024        Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002

*Attorneys for Plaintiff-Appellant
Eljon Lako*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3932 _____

I am the attorney or self-represented party.

**This brief contains 13,082____ words,** including 52 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Francis A. Bottini, Jr._____ **Date:** October 15, 2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

51

## CERTIFICATE OF SERVICE

I certify that, on October 15, 2024, I caused the foregoing Appellant's Opening Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of October 2024, at La Jolla, California.

<i>s/</i> Francis A. Bottini, Jr.<br>
Francis A. Bottini, Jr.